CHASEZ, Judge.
Plaintiff, James Duncan, seeks to recover workmen’s compensation from defendants, Carlo Ditta, Inc., and its insurer, Employers’ Liability Assurance Corporation, Limited, for total and permanent disability. He also prayed for penalties and attorney’s fees. From a judgment granting plaintiff workmen’s compensation on the basis of total and permanent disability for the duration of his disability at the rate of $35.00 per week, subject to a credit of $328.90, together with medical expenses, expert fees and costs, the defendants appeal. Plaintiff answered the appeal asking for attorney’s fees and penalties.
The record reveals some ambiguity in the testimony relative to how the injury occurred; however, as a whole, it was established that an injury did occur to plaintiff while he was within the course and scope of his employment.
After the accident, plaintiff continued to work for approximately a day and a half. He was then sent to Dr. Douglas A. Had-dow, a surgeon, who treated him on an outpatient basis for about five days for a lumbo-sacral strain. He was then admitted to the West Jefferson General Hospital and placed in traction for ten days. During his hospitalization he was examined by Dr. H. F. Soboloff, an orthopedic surgeon, and Dr. Carl F. Culicchia, a neurosurgeon. After his release from the hospital he was treated on an outpatient basis for approximately two months by Dr. Had-dow and discharged as being able to return to work. Shortly thereafter he was seen by Dr. Blaise Salatich, who proceeded to treat him as an outpatient for a lumbo-sacral strain until the time of trial. All of the above named physicians testified at the trial of this matter.
There is no doubt that the testimony in this matter conflicts. While it is true that Dr. Haddow had discharged James Duncan as being able to return to work, we are of the opinion that the medical evidence indicates that Duncan was suffering from emotional disturbances diagnosed as conversion reaction as a result of the injury sustained by him and therefore was unable to perform the duties required of him by his employment with Carlo Ditta, Inc.
During the course of the trial the Court permitted the pleadings to be amended, amplified and enlarged by oral motion to allow psychiatric testimony. The plaintiff offered the testimony of Dr. Charles R. Smith, a psychiatrist. Dr. Smith’s testimony was predicated upon his personal examinations of plaintiff and psychological testing done by Dr. Nathan M. Lubin, a psychologist. Dr. Smith’s findings were that the plaintiff was an intellectually retarded individual with an age level of eight years and an I. Q. of 60. He was a passive and dependent individual who unconsciously had expectation of being cared for. His symptoms transcended his original back injury inasmuch as he also had pains in his head. He had complaints of noises bothering him and had difficulty sleeping. Dr. Smith further testified:
It was the impression from the various tests that Dr. Lubin gave, as well as my examination, that whatever he described during by interviews; the pains and aches, were quite real to him and had become a rather deeply ingrained part of his personality, fulfilling some basic personality needs.
“Diagnostically, I think that we might term his disorder as one of a conversion reaction. That is, a conversion of already present emotional conflict into physical symptomotology; but, it would appear to me, there being no evidence to the contrary, that prior to the accident, he managed to function relatively well without any outstanding problems.
“He worked as a laborer and managed to get along reasonably well, until such time as this particular accident *871 threw him into this state which I have described.
"MR. GIEPERT:
“Q. Doctor, do you have any opinion as to the accident which occurred on November 19, 1962, as far as triggering this particular neurosis you are speaking of?
"A. Well, the impression of Dr. Lubin, as well as that of my own; this man is an individual with a chronic form of depression. A person who has limitations in his ability to function in many ways.
“But from the history obtained, as I said, I had no other information to the contrary; he worked for a couple of companies that he told me about, without any outstanding difficulty.
"He worked for the beverage company, Barq’s, and then he quit The Acme Dairy Company for three or four years, and he did not seem to have any overwhelming difficulty that is in any way similar to what he is experiencing now.”
‡ ;¡í sf:
“Q. Do you have an opinion Doctor, as to whether this man feels pain or not?
“A. I do feel he is experiencing pain.
“Q. Is your opinion that he is feeling pain? Is it your opinion?
“A. It is my opinion.
“Q. Based on your examination and conferences with this man ?
“A. It is my opinion that he is feeling pain.”
*****
“Q. He will have problems no matter what happens the rest of his life ?
“A. The points I made or intended to make in my testimony, was that the problems that he had before did not prevent him from working and going about his business. Whereas now, he is virtually crippled by problems.
“Q. You don’t blame this on the accident, do you?
“A. I don’t see anything else that ties in quite so closely with his present situation as the accident.
“The financial difficulties, the relationship with his wife and that sort of thing doesn’t tie in with the complaints he has now.”
*****
"Q. Do you have an opinion as to whether this accident could have triggered this state that Mr. Duncan is in now?
“A. Well, it is my opinion that without the accident having occurred, that there would have been a continuation of the patient’s adaptation to live and his ability to function such as it was before this accident occurred and from all I can gather, this was relatively satisfactory within his limitations.
“The accident served to unbalance a precariously balanced state and set off another chain of events that added to the present problem and you might say that is the trigger; I suppose that is a way of saying that and certainly this unleashed more symptoms than he had, to the point that he is disabled, where he wasn’t before.”
*872 The defendant in rebuttal offered the testimony of Dr. Robert L. Head. He concurred with Dr. Smith’s diagnosis of a conversion reaction. His testimony, in part, follo-ws:
“Q. Doctor, would you give us your findings as a result of your examination of Duncan?
“A. Well, as a result of my examination, I found him to be suffering from a neurotic reaction. The type being conversion hysteria, with depression.”
*****
“Q. You say that James Duncan does not have traumatic neurosis?
“A. No, sir.
“Q. But, he has conversion neurosis?
“A. Yes, sir.
“Q. And you also testified—
“A. And depressive reaction.”
*****
“Q. At the time you examined James Duncan, was he complaining about pain in his back?
“A. Yes, sir.
“Q. Do you believe he has these pains ?
“A. I don’t know whether he is hurting or not. I don’t think anybody can tell for sure whether another human being is suffering or not. All I can go by is what he told me. He told me he hurt.
“Q. Do you have an opinion on that? Do you have an opinion of whether he is consciously or unconsciously feeling pains?
“A. He acted as though he hurt
“Q. He acted as though he hurt?
“A. Yes.
“Q. You would say he is unconsciously feeling these pains?
“A. Well, it would be unconsciously motivated but consciously felt.”
He further testified as follows:
“Q. Doctor, the field of Psychiatry, can you or any other Psychiatrist come to the conclusion, as a result of your examination only, that a man is suffering pain?
“A. No.
“MR. HAYLON:
“That is all.
“FURTHER RECROSS EXAMINATION
“MR. GIEPERT:
“Q. You cannot say he is suffering pain, but you can have an opinion to whether he is consciously flinching this pain?
“A. Sure.
“Q. Your opinion, as you stated, this man was not consciously flinching this pain? He looked as though he was in pain ?
“A. Yes, sir.”
The record establishes that the plaintiff is not a malingerer. Prior to the injury he was able to perform heavy, laborious duties required of him by his employment. Since his injury he has not been able to work at all because of the pain he suffers. Under the law an injured workman is not required to work in pain. It may well be that plaintiff’s condition and pain is caused by conversion reaction but nevertheless this condition has caused him permanent and total disability within the scope of the workmen’s compensation law. Therefore, from our review of the record we are in accord with the trial judge and believe that the plaintiff is disabled as a result of his conversion reaction.
*873 In Lala v. American Sugar Refining Co., 38 So.2d 415 (La.App.1949), it was stated by this Court:
“There is no doubt in our minds that nervousness, neurosis, or emotional disturbances, superinduced by injuries suffered by a workman, can be just as devastating to the ability to return to work as are physical or anatomical injuries, and are equally as compensable under the statute.
“Our brothers of the second circuit, in the case of Porter v. W. Horace Williams Co., La.App., 9 So.2d 60, 63, were concerned with a plaintiff who suffered from nervousness directly traceable to the accident, which prevented his doing work of a reasonable character. It was held that such was a disabling condition and was compensable under the Workmen’s Compensation Act, Act No. 20 of 1914, as amended. The court said:
“ ‘All of the physicians agree, however, that plaintiff is suffering from nervousness to such an extent that he is totally disabled to do work of a reasonable character, and that the duration of this disability is impossible of determination, thus compelling its being classified as permanent.
“ ‘This disabling condition is com-pensable if there exists a causal connection between it and the accident and injuries sustained by plaintiff on January 10, 1941. * * *”’
The plaintiff urges that we award penalties and attorney’s fees in this case. The plaintiff was paid $29.90 per week for eleven weeks during his physical disability. We do not think that the discontinuance of benefits was arbitrary and capricious for it was based on the reports of three competent physicians. The plaintiff further contends that the compensation payments were underpaid. The plaintiff was earning $1.15 an hour which under our jurisprudence, using the formula in Darby v. Johnson, 118 So.2d 707, would entitle him to the maximum amount of $35.00 per week. It is well settled that compensation must be paid on a basis of a six day week instead of a five day week as was done in this case. Therefore, on the difference of what should have been paid during the eleven weeks of voluntary payments and what was actually paid, to-wit: the sum of $56.10, we award plaintiff legal interest until paid, 12% penalties and 20% attorney’s fees. In all other respects the judgment appealed from as amended is affirmed. All costs shall be borne by defendants.
Amended and affirmed.