Accidental injuries were experienced by plaintiff, Arlow W. Porter, on the morning of January 10, 1941, while engaged as an employee with the W. Horace Williams Company in the construction of an army camp in Rapides Parish, Louisiana, known as Camp Claiborne.
For thirteen weeks thereafter he received workmen's compensation at the rate of $20 per week. Additionally, during that period, medical service of the value of $27 was furnished him.
On September 2, 1941, following a discontinuance of the compensation payments, this suit was filed against the named employer and its insurer, the Employers' Liability Assurance Corporation, Ltd. In the petition plaintiff alleges the occurrence of an accident on January 10, 1941, and that, as a result of it, "he sustained injuries to the muscles, tissues, bones, ligaments, cartilages and nerves of his back, and that he sustained injuries and shocks to his general nervous system, all to such severity and extent as to render him permanently and totally disabled to perform any work of any reasonable character."
Plaintiff asks judgment against defendants awarding compensation appropriate to the described disability and ordering payment of the maximum medical expenses authorized by the Louisiana Employers' Liability Act, Act No. 20 of 1914.
The defense to the action is summarized in the following two paragraphs of the answer:
"Further answering said suit, defendants show that plaintiff sustained no accidental injuries as alleged; that while he claimed to have strained his back while handling lumber on January 10, 1941, there were no objective symptoms of said claimed injury; that acting solely on plaintiff's statement his employer referred him to physicians and paid him Twenty and No/100 ($20.00) Dollars per week compensation from January 10, 1941, to April 10, 1941, or Two Hundred Sixty and No/100 ($260.00) Dollars as such, that it now believes, and therefore alleges, that plaintiff's whole claim was, and is, based upon his morbid imagination due to psychosis from which plaintiff has been suffering, and which is not due to accidental injury, but, on the contrary, to mental delusion of persecution or similar psychic causes.
"Further answering said suit, defendants show that they owe plaintiff nothing; that if plaintiff sustained any accidental injury on the date alleged, same was a minor injury, he having been able to work around said Camp Claiborne for several days thereafter; the said defendants, through error paid him considerably more compensation than he was possibly due for any slight injury he might have sustained, and in any event, claims that plaintiff entirely recovered from any causal effect of any slight injury he may have sustained at any time while working for the W. Horace Williams Company."
In due course the case on its merits was tried, and there was judgment condemning defendants in solido to pay to plaintiff $20 per week during the period of his disability but not exceeding 400 weeks, less credits totaling the sum of $260, and additionally $223 for medical, surgical and hospital services and for medicines. From it defendants are prosecuting this appeal.
Plaintiff's employment with the W. Horace Williams Company commenced on October 15, 1940, and continued without interruption until the date of the hereafter described accident. He served as an apprentice or cub carpenter, and his duties consisted largely in the erection and demolition of scaffolds used by regular carpenters.
On the morning of January 10, 1941, so plaintiff testified, he sought to carry out the instruction of his foreman to detach a scaffold cleat or bracing that was nailed *Page 62 
to the wall of a building. To accomplish this he stood on a board located on top of two frame saw horses approximately three and one-half feet above the ground and used a piece of timber as a contacting or knocking tool. The cleat, situated above his head, was struck several times without its removal being effected. Again he swung, but this time contact was not made. This failure caused his becoming unbalanced; and he fell to the ground, a distance of three and one-half feet, landing in a sitting position.
Defendants seriously doubt his experiencing a fall, their doubt being based primarily on a written statement signed by plaintiff shortly after the accident in which he said that "he struck and missed the stob and sprained his back." We are inclined to accept the version given by plaintiff in his testimony, which described a fall, as showing the correct manner of the accident's occurrence. No one but him was present at the time. The cleat which he sought to remove was made of old lumber and was shaped somewhat like a stob ordinarily used for driving into the ground. Furthermore, in the history that he later gave to most of the numerous physicians examining him the occurrence of a fall was related.
Immediately after the accident happened plaintiff confronted his foreman, in a stooping position and said: "You got anything light around here that I can do, I wrenched my back." This superior replied: "No, I haven't, but you report to the first aid station over there, and let them tape your back, and maybe you can go on with your work."
To such station, located about 150 feet away, plaintiff went as directed; and from there he was sent in an ambulance to a hospital maintained on the job. In this place the company physician examined him. There were no objective findings; however, the employee complained of pain in the lumbar region of the back.
Plaintiff, following the examination, returned to his foreman and was permitted for parts of two days to do light work around the electric saw. This consisted of turning the saw's switch on and off and of handing small pieces of timber to the operator. It required no physical exertion.
The employee made four other visits to such physician, on each of which occasions treatments of strapping and infra-red rays were given. During the last visit he still complained of pain in his back.
On January 23, 1941, plaintiff was examined by Dr. John T. Moseley of Winnfield, Louisiana, his family physician for about eight years, who decided that he was suffering from a sacro-iliac strain. For this ailment diathermy treatments were given but without beneficial results.
Next he consulted Dr. M.B. Pearce of Alexandria, Louisiana, this being on February 11, 1941, complaining of pain in the lumbar region of the back. Pain on motion was observed in the examination at which the patient cooperated thoroughly; but there were no clinical findings of fractures or sacro-iliac strain.
Dr. John T. Moseley was called to plaintiff's home on the night of March 31, 1941, and there found him in bed, in an irrational state, with two men attempting to control him. His left leg was without motion, while the right one was afflicted with constant quivering or tremor. This nervous condition was diagnosed as psychoneurosis.
The following day plaintiff was carried to Monroe, Louisiana, for examination by Dr. C.H. Moseley, who is not related to Dr. John T. Moseley. This physician, in addition to examining him clinically, made X-rays of his spine and sacro-iliac joints. The conclusion reached was that he suffered a fracture of the fifth lumbar vertebra, an injury to the disc between the fourth and fifth lumbar vertebra, an injury to the sacro-iliac joint with evidence of traumatic arthritis, and traumatic neurosis. It was noticed that the left leg possessed no motion and that a tremor of the right leg existed.
A trip was then made by plaintiff to Memphis, Tennessee, where specialists there were consulted. On his return to Monroe, Louisiana, Dr. C.H. Moseley again examined him and noticed that the neurotic condition had grown worse. A severe state of shock endured. Thereupon Dr. Moseley sent him to Dr. Guy A. Caldwell in New Orleans.
Dr. Caldwell examined him, clinically and also by means of X-rays, at Touro Infirmary on April 21, 1941, and concluded "that the trouble was of the nature of psychoneurosis following injury." No evidence of fracture or other bone pathology was seen. There was "no organic disturbance or derangement of the back or legs in any way." *Page 63 
Dr. Lewis A. Golden, a psychiatrist and a specialist in neurological diseases who practices in New Orleans, next examined and treated plaintiff. Dr. Golden, offered as a defense witness, testified: "I was called into consultation by Dr. Caldwell, who asked me to see Mr. Porter on April 23rd. The patient had arrived at Touro by ambulance, and was under the influence of drugs which had been given to quiet him. When I saw him he was quite disturbed; there were a good many people in the room all holding him down. He cried out continually, stating that he had pain in his back which he could feel traveling up his spine. He was throwing himself about on the bed, his right leg was continuously shaking severely, and he complained of being unable to feel any sensations in his left leg. It appeared that whenever his right leg would begin to shake he would yell for the people in the room to grab it, and this they would do, while he continually twisted around and cried out."
With further reference to the examination, he reported: "Cranial Nerves: All normal, his pupils widely dilated with his fear and apprehension. There was marked flushing of his face, and perspiration all over his body from his continual exertion. The patient appeared to be either in great fear or in great pain. Motor Examination: The upper extremities were normal in size, tone and strength. The lower extremities revealed an absence of sensation in the whole left leg and foot up to the thigh, and including the thigh. This was true for all form of sensation, and was functional in outline. Any attempt to touch the right leg, even lightly, at once set it off into severe shaking, with the patient pleading that he not be touched. There was no wasting of any of the muscles, and the reflexes were everywhere normal."
Additionally, he testified: "Impression: The evidence from the neurological examination revealed that the patient was suffering from no organic neurological condition. The findings fitted in with the diagnosis of hysteria. If it be shown that the symptoms began for the first time after the accident, my diagnosis would be traumatic hysteria."
Also Dr. Golden observed: "I believe that the symptoms in these conditions are real to the patient, except when they are obviously malingering. I do not feel that he is a malingerer, consciously."
A medical examination was given plaintiff during the course of the trial, and it was then noticed that his body, when being bent forward, jerked and twitched and his legs were unstable.
A preponderance of the medical testimony adduced favors the defense contention that the various X-rays made of plaintiff's back revealed no bone pathology. Only Dr. C.H. Moseley, among the several experts who interpreted the pictures, saw any evidence of fracture or other bone injury.
All of the physicians agree, however, that plaintiff is suffering from nervousness to such an extent that he is totally disabled to do work of a reasonable character, and that the duration of this disability is impossible of determination, thus compelling its being classified as permanent.
This disabling condition is compensable if there exists a causal connection between it and the accident and injuries sustained by plaintiff on January 10, 1941.
In Schneider's Workmen's Compensation Law, Volume 1, Section 204a, it is stated: "Even though an accident may not produce an anatomical pathology, nevertheless if the workman does in fact become disabled as a result of that accident, the injury is compensable, although such disability may be the result of hysteria — and may be traceable to a mental condition and not a physical disorder."
The stated rule was followed in Vaughn v. Solvay Process Company, La.App., 176 So. 241, 245, in the opinion of which case the court said: "While the weight of the evidence supports the conclusion that plaintiff is incapacitated from doing hard manual labor because of the physical injuries to the bones of his hand, the weight of the medical evidence also supports the conclusion that his condition is intensified and exaggerated by his mental attitude. If his physical condition resulting from the injury is of such a nature as to cause traumatic hysteria, making plaintiff believe that he could not work for fear of increasing the pain in the arm, he would still be entitled to compensation."
The court expressed the view in Wilkinson v. Dubach Mill Company, Inc., 2 La.App. 249, that where a fall, with the attending shock, caused a hysterical condition, the resulting disability is compensable. *Page 64 
Dr. Golden, as above shown, would diagnose plaintiff's condition as traumatic hysteria if it be shown that the symptoms commenced after the accident. In this connection, the evidence conclusively discloses that previous to January 10, 1941, the employee had never experienced hysteria or other neurotic trouble. For a long time prior to that date he had been an able bodied hard working person, and his work as a manual laborer was always satisfactorily performed.
Furthermore, the following question was propounded by plaintiff's attorney, under cross examination, to Dr. Caldwell: "Doctor, you were of the opinion at that time that he was suffering from psychoneurosis as a result of an injury?" The reply was: "Which followed an injury and was doubtless precipitated by an injury, yes, sir."
This discussed medical proof, along with other evidence in the record, is convincing that plaintiff's disability is directly traceable to the above described accident; and for it he is entitled to compensation.
Defense counsel argue that "if plaintiff has ever suffered from fear complex, that condition was most probably due entirely to contacts and circumstances in no manner connected with his claimed accident and original injury, but rather, to the fright given him by Dr. C.H. Moseley, when without apparent factual basis, for his findings, he led plaintiff to believe his back was broken in many places and that he was a hopeless cripple. The defendants did not select Dr. Moseley, therefore they are no more responsible for the results of his conduct or treatment than if he had, through error, amputated both of plaintiff's legs."
The answer to this argument is that plaintiff was suffering from his neurotic trouble before Dr. C.H. Moseley was ever consulted.
Our attention is directed by them to the case of Stanford v. Long Wolfe, La.App., 199 So. 608, 610, in which the court recognized the rule that a traumatic hysteria condition is compensable, but said that: "* * * there should be a sound cause and good reason for the mental condition which superinduces a fear of pain in the individual strong enough to render him totally disabled."
The sound cause or good reason for the condition of this plaintiff is the proven back injury that attended the proven accident. Although bone pathology was perhaps not observable, the injury sustained, according to the medical experts, was nevertheless sufficient to bring about the affliction suffered.
The judgment, in our opinion, is correct. It is affirmed, with costs.
DREW and TALIAFERRO, JJ., concur.